IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KAREN MORRIS, DEBRA
RUFFIN, and WILMA BRADLEY,

          Plaintiffs,

     v.

ARNE DUNCAN,
Secretary Department of Education,

          Defendant.

CIVIL ACTION FILE

NO. 1:08-CV-3566-JFK

## FINAL ORDER AND OPINION

Plaintiffs Karen Morris, Debra Ruffin, and Wilma Bradley filed the above-styled employment discrimination action against Defendant Arne Duncan, Secretary Department of Education, on November 18, 2008.  [Doc. 1].  Plaintiffs filed a substituted complaint which contains the claims currently before the court on November 12, 2009.  [Doc. 29].  All of the claims are brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq*. [Doc. 29].  Plaintiffs Morris, Ruffin, and Bradley allege that they were subjected to adverse employment actions in retaliation for prior complaints of discrimination.  [Id. at 14-15, 19-20, 29-31].  Plaintiff Bradley also alleges that she was subjected to gender discrimination.  [Id. at 23-25].  Defendant has moved for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure on all of Plaintiffs' claims based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted to the court.  [Doc. 67].

## I.    Facts

When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party."  Comer v. City of Palm Bay, Florida, 265 F.3d 1186, 1192 (11th Cir. 2001).  However, mere conclusions and unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendant's motion [Doc. 67] for summary judgment.

Plaintiffs Karen Morris and Debra Ruffin are GS-12 Loan Analysts in the U.S. Department of Education's Atlanta Service Center for Borrower Services ("the Agency").  [Doc. 88, Defendant's Statement of Material Facts ("DSMF") ¶¶ 1, 2]. Plaintiff Wilma Bradley is a GS-11 Loan Analyst in the Agency.  [DSMF ¶ 3].  The

AO 72A
(Rev.8/82)

Education Department Performance Appraisal System ("EDPAS") governs the Plaintiffs' performance evaluations and was incorporated into the Personnel Manual Instruction 430-2 effective January 1, 2003.  [DSMF ¶ 4].  The appraisal system consists of five possible ratings of record:

> Outstanding (O): 4.75 or above
> Highly Successful (HS): 4.00 but less than 4.75
> Successful (S): 3.00 but less than 4.00
> Minimally Successful (MS): 2.00 but less than 3.00
> Unacceptable (U): Below 2.0

[DSMF ¶ 5].  The EDPAS guidelines provide that only employees with ratings of "Highly Successful" or "Outstanding" qualify for a monetary award. [DSMF ¶ 6; Doc. 108, Plaintiffs' Statement of Material Facts ("PSMF") ¶ 11].

Pursuant to the Personnel Manual Instruction, supervisors are required to rate an employee's performance on the elements identified (achievement level points from 1=Unacceptable to 5=Outstanding), assign the summary rating (average) of record, and provide narrative justifications for each critical element rating.  [DSMF ¶ 7].  The approving official must review and approve the summary rating of record.  [DSMF ¶ 8]. The Personnel Manual Instruction states the following in pertinent part under the heading "Appraising Performance":

3

Supervisor considers any input submitted by the employee on tangible accomplishments that the employee would like to have considered for the mid-point progress review.  Supervisor conducts the mid-point progress review and discusses any developmental activities that would help improve the employee's performance. . . .  Employee is strongly encouraged to provide the supervisor with a list of tangible accomplishments for each critical element.  Employee may also provide his/her supervisor with information from other sources regarding his/her performance (e.g., letters, e-mail) that the employee wishes to have considered.  Supervisor considers input by the employee and information from other sources (e.g., customers, co-workers, other supervisors) that has come to the supervisor's attention.  Supervisor rates employee's performance on elements, assigns the summary rating of record and provides narrative justification for each critical element rating.

[Defendants' Exhibit ("Def. Ex.") 4-1 at 8-9; Doc. 69, Attach. 4 at 8-9; DSMF ¶ 9;

Plaintiffs' Response ("Pla. Resp.") to DSMF ¶ 9].

Sue Szabo was the General Manager of Borrower Services, Federal Student Aid, in Washington, D.C.  [DSMF ¶ 10].  In November 2005 and again in January 2006, Szabo sent emails to Agency staff announcing plans for the reorganization of Borrower Services, which involved personnel changes and the reassignment of job duties. [DSMF ¶ 10; Pla. Resp. to DSMF ¶ 10; Swanson-Hall Deposition ("Dep.") at 19; Def. Ex. 3; Pla. Ex. 6].  Erin Swanson-Hall, Regional Director, Federal Student Aid, Atlanta Collections, testified that she made personnel recommendations in the reorganization, and Szabo made the personnel decisions.  [Swanson-Hall Dep. at 19-20; DSMF ¶ 11].

4

Swanson-Hall also made accepted recommendations for the placement of functions. [PSMF ¶ 4].

Prior to the reorganization, there were four functional branches in the Atlanta office: (1) Administrative Wage Garnishment ("AWG"); (2) AWG Hearings; (3) Loan Services; and (4) Contract Services. [DSMF ¶ 12]. After the reorganization, the Atlanta office had 3 branches: (1) AWG Compliance ("AWG Branch"); (2) Contract Analysis and Compliance I; and (3) Contract Analysis and Compliance II. [DSMF ¶ 13]. In all, more than 50 percent (27 of 47 employees) of the Borrower Services staff, including eight of eleven GS-12 employees (among them Plaintiffs Karen Morris and Debra Ruffin), were reassigned in the reorganization. [DSMF ¶ 14].

Prior to the reorganization, John Jordan was the Chief of the AWG Hearings Branch, which was transferred from Atlanta to the Chicago Regional Office. [DSMF ¶ 16]. In January 2006, Jordan became the Chief of the AWG Branch as a result of the reorganization. [DSMF ¶ 15; Pla. Resp. to DSMF ¶ 15; Pla. Ex. 14]. As the manager of the AWG Branch, Jordan was the rating official for all three Plaintiffs for the 2005-2006 EDPAS rating period, and Swanson-Hall was the approving official. [DSMF ¶ 17]. Jordan uses the elements that are described in the Personnel Manual Instruction and the EDPAS when rating the employee. [PSMF ¶ 9]. Employees

submit their accomplishments to Jordan as the rating period approaches and are given weight if they helped the Branch go forward and are supported by the work reports. [PSMF ¶ 10].  When an employee goes on a temporary detail, it is taken into consideration in the performance appraisal, and the rating official typically gets input from the temporary supervisor in writing.  [PSMF ¶ 12].

Plaintiff Morris filed at least three EEO actions (the latest occurred in August 2004) before filing the administrative complaints giving rise to this action.  [DSMF ¶ 18].  Both Morris and Plaintiff Ruffin filed an EEO complaint in late 2003 or early 2004, which resulted in a settlement in 2005.  [PSMF ¶ 1; DSMF ¶ 36; Def. Exs. 7, 11].  Swanson-Hall was the management official named in this EEO complaint and was involved in the subsequent settlement.  [PSMF ¶ 3].  On October 1, 2005, Morris received a temporary promotion to GS-13 Management/Program Analyst as a result of the settlement of her EEO complaint against Swanson-Hall.  [Pla. Ex. 1, Morris Affidavit ("Aff.") ¶ 12].

As a result of the reorganization, Morris was reassigned from the AWG Hearings Branch to the AWG Branch effective March 2006.  [DSMF ¶ 19].  Morris had requested a transfer to the AWG Branch approximately one year earlier, before Jordan was the AWG Branch Chief.  At that time, an individual named Adam Evans

was the AWG Branch Chief.  [DSMF ¶ 22; Morris Aff. ¶ 10].  In support of her 2005 request to transfer to the AWG Branch, Morris stated that her "skills would be beneficial to work on several writing tasks that are currently assigned to the AWG branch[,]" and she stated that she had "an AWG Branch proficiency."  [DSMF ¶ 23]. Morris testified that at the time the new personnel assignments among the branches were announced, she had previously worked with Jordan for over a year.  [Morris Dep. at 26; DSMF ¶ 24].  After the reorganization, both Jordan and Swanson-Hall knew that Morris was doing work for the Loan Services Branch and, at the same time, completing work for the AWG Branch.  [PSMF ¶¶ 14, 15].

In March 2006, Plaintiff Morris asked to be reassigned to the Contract Services Branch.  [DSMF ¶ 25].  Morris gave Swanson-Hall a written complaint stating that she did not want to be assigned to work under Jordan.  [PSMF ¶ 5].  Morris raised issues she had with Jordan as her manager, but Swanson-Hall denied her request.  [DSMF ¶ 25].  According to Swanson-Hall, she was aware that Morris had complained about communication issues with Jordan before, but Swanson-Hall did not believe the issues were significant problems.  [Def. Ex. 7 ¶ 7; Def. Ex. 14; DSMF ¶ 26].  Morris stated in her affidavit, "Ms. Swanson-Hall was aware that I had complained about communication issues with and the supervision abuse of John Jordan but Swanson-

Hall did not investigate.  There were no questions asked of me, no list of witnesses requested from me, and no additional documentation requested from me to support my written complaints of supervisory abuse."  [Morris Aff. ¶ 13; Pla. Resp. to DSMF ¶ 26].  In an email to Morris dated March 2, 2006, Swanson-Hall wrote in part, "I do recall that there were some benign communication issues around a meeting and work distribution.  As I recall, the nature of the complaint centered around the reassignment of work and an oversight for not including you in a meeting–of which neither warrants an 'investigation.'"  [Pla. Ex. 15; Pla. Resp. to DSMF ¶ 26].

Plaintiff Morris received an EDPAS rating of "Successful" for the 2005-2006 rating period, based on ratings of "3" for each critical element.  [DSMF ¶ 27].  Jordan stated that in issuing his rating, he considered written input provided by Swanson-Hall and Gary Hopkins (General Manager, Borrower Services), who had managed Morris during a 120-day detail from October 2005 to January 2006.  Hopkins had issued Morris a written interim rating of "Highly Successful" during the time when she had worked at a higher pay grade level of GS-13.  [Def. Ex. 16 ¶ 4; Def. Ex. 17 ¶¶ 3, 4; DSMF ¶ 28; Pla. Resp. to DSMF ¶ 28].  The comments Hopkins provided were reflected in the narrative of the EDPAS rating for the first critical element, which discussed the projects Morris handled while on detail.  [Def. Ex. 7 ¶ 11; Def. Ex. 8;

8

Morris Aff. ¶ 16; DSMF ¶ 29; Pla. Resp. to DSMF ¶ 29].   According to data summaries of Morris' work output submitted by Jordan, from March-April 2006, the last two months of the EDPAS cycle, it took Morris between 8 and 21 days to complete garnishment verifications for 50 accounts.   Jordan stated, "It takes my slowest GS 11 loan analyst approximately 2.5 hours to complete a batch of 50 accounts."   [Def. Ex. 18 ¶ 8].

All GS-11 Loan Analyst duties are expressly subsumed in the GS-12 Loan Analyst position description, so a GS-12 Analyst is required to perform GS-11 Analyst duties.   [Swanson-Hall Dep. at 58-59; Def. Ex. 18 ¶¶ 6-8; Def. Exs. 20, 21; DSMF ¶ 31].   Plaintiff Morris stated that GS-12 Analysts have additional duties and require access to the Branch database that is not needed by GS-11s for their level of assigned work.   [Morris Aff. ¶ 18; Pla. Resp. to DSMF ¶ 31].   In addition, "GS-11 employees did not serve as Team Leaders, or report to the supervisor regarding the AWG program status."   [Morris Aff. ¶ 18].

According to Jordan, because Morris was a new GS-12 Analyst to the AWG Branch, she needed to be trained, become acquainted with the AWG processes, and get up to speed with the other GS-12s.   [DSMF ¶ 32; Pla. Resp. to DSMF ¶ 32].   Jordan stated that Morris "was first given GS-11 duties, with the idea that as she gained more

9

knowledge and became proficient performing the GS-11 functions, additional higher-level functions would be added." [Def. Ex. 18 ¶ 8]. Swanson-Hall testified that the GS-11 and GS-12 position descriptions are "almost identical position descriptions with the exception of mentoring and coaching and being responsible for other duties as assigned, including special projects." [PSMF ¶ 23]. According to Jordan, GS-12 Loan Analysts are not allowed to assign work to coworkers.[1] [PSMF ¶¶ 18, 19]. Jordan also stated that each of the GS-12 Senior Loan Analysts in the Hearings Branch worked as mentors to GS-11s. [Jordan Dep. at 30; PSMF ¶ 18]. GS-12s have the opportunity to do special projects, and these help employees receive a higher rating. [PSMF ¶ 24].

On January 31, 2006, Morris took office as President of the local union. Jordan stated that pursuant to Morris' request, she was granted a 50 percent reduction in work duties to cover union responsibilities. [Def. Ex. 18 ¶ 8; DSMF ¶ 33]. Morris stated, "[T]he work reduction was requested for 90 days, but the granting was temporary, and was not enforced at 50%. Work continued to be assigned to me, even when I [was] approved to be out of the office, and assigned work was already four and five days old upon my return to the office." [Morris Aff. ¶ 20].

---

[1] According to Plaintiff, Swanson-Hall testified that GS-12 Loan Analysts were not team leaders. In reality, Swanson-Hall stated that the title of "team leader" was not used in the Regional Office. [Swanson-Hall Dep. at 45; PSMF ¶ 19].

10

On July 20, 2006, Morris submitted a time and attendance sheet to Jordan by email while she was at home on sick leave.  That afternoon, Jordan replied to Morris by email, pointing out that the time sheet should have been submitted by noon per his directive, but he received it at 1:52 p.m.  [Def. Ex. 23; DSMF ¶ 34].  Morris notes that under the terms of the Personnel Manual Instruction, an employee absent due to illness is required to submit a leave request "prior to the leave period, when possible, or immediately upon the employee's return from unscheduled sick leave."  [Morris Aff. ¶ 21].  Morris' leave request for that day was approved by Jordan.  [DSMF ¶ 35].

Plaintiff Debra Ruffin was a co-complainant with Morris in an EEO action filed in 2003 and resolved in 2005.  [DSMF ¶ 36].  Prior to the reorganization of Borrower Services in March 2006, Plaintiff Ruffin worked in the old Contract Services Branch under the supervision of David Bartnicki, who reported to Swanson-Hall.  [DSMF ¶ 37].  In November 2005, Ruffin learned of her reassignment from the Contract Services Branch to the AWG Branch that would be effective March 2006.  She told Bartnicki and Swanson-Hall that she did not agree with the decision to take her out of the contracts function.  [DSMF ¶ 38].  At the time Ruffin was transferred, there were other GS-12s who remained in the Contract Services Branch.  [PSMF ¶ 6].  According to Swanson-Hall, she based her recommendation to assign Ruffin to the AWG Branch

11

on the needs of the Branch and Ruffin's skill set.  [Def. Ex. 4 at 297, 313-14; DSMF ¶ 39].  However, Ruffin stated in her affidavit, "I did not have the skill sets to work in AWG because I had never worked in the Branch.  I had no work knowledge of how the AWG branch operated on a day to day basis nor the AWG policy, procedures or regulations."  [Ruffin Aff. ¶ 5].  Swanson-Hall testified that it would be beneficial for an employee to have the skill set in contracts in AWG.  [PSMF ¶ 7].  Swanson-Hall met with Ruffin to explain her justification for the assignment to the AWG Branch, but Ruffin claims to have no knowledge of any organizational, strategic or business reasons considered by the Agency in reassigning her.  [DSMF ¶ 42].

Ruffin received an EDPAS rating of "Successful" from John Jordan for the 2005-2006 rating period.  [DSMF ¶ 43].  David Bartnicki, as Ruffin's first-line supervisor from May 2005 until February 2006 (when Ruffin went on a detail), provided input to Jordan for the evaluation.  [DSMF ¶ 44].  According to Bartnicki, he had concerns about the quality of Ruffin's written product and her communication and customer service skills.  [Def. Ex. 4 at 394-445; DSMF ¶ 45].  The concerns that Bartnicki had with Ruffin's work impacted two of nine elements in her EDPAS rating, both of which reflect a rating of "3/Successful."  [Def. Ex. 4 at 403, 409, 425, 430, 441-42; Def. Ex. 9; DSMF ¶ 46].  The first was Element I, Item 5 – "Assists in the

12

development of drafts/final documents, ensuring the proper use of format and language, and the accuracy of content.  (Supports the strategic plan.)"  [Id.].  The second element on which Bartnicki rated Ruffin a "3" was Element II, Item 5 – "Communicates clearly, courteously, and effectively both orally and in writing with internal and external customers."  [Id.].  Ruffin testified that she only disagrees with the "3"she received for Element II.[2]  [Ruffin Dep. at 49-50; DSMF ¶ 47].  She testified that she "should have gotten a four or a five" because, according to Ruffin, "I've always treated all of our customers courteously and clearly.  I've never been abrupt to any private collection agency or anything like that."  [Ruffin Dep. at 50].

---

[2]In her affidavit, Plaintiff Ruffin acknowledges that at her deposition she testified that she only disagrees with the "3" she received for Element II. [Ruffin Aff. ¶ 9].  However, she now states, "[A]ll elements should have been a 4 or a 5."  [Id.].  Ruffin alleges, "I was nervous at my deposition and made a mistake in answering the question."  [Id.].  The court finds this explanation lacks validity.  At her deposition, Plaintiff Ruffin gave clear answers to unambiguous questions.  [Ruffin Dep. at 49].  Moreover, she did not change her response to the question when she had an opportunity to read and sign her deposition.  The statements in her affidavit which are inherently inconsistent with her deposition testimony on this issue were not based on newly discovered evidence and did not clarify confusing testimony.  For these reasons, "although 'this rule is applied sparingly because of the harsh effect it may have on a party's case,'" the court will not consider this portion of Ruffin's affidavit because it contradicts her deposition testimony without providing any valid explanation for the contradiction.  Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237 (11th Cir. 2010) (quoting Allen v. Bd. of Pub. Educ. for Bibb Cty., 495 F.3d 1306, 1316 (11th Cir. 2007)); and see Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc., 736 F.2d 656 (11th Cir. 1984).

13

In deciding the final rating, Jordan considered not only the input from Bartnicki, but that provided by Gary Hopkins, who supervised Ruffin for 90 days of the rating period while she was on a detail.  [DSMF ¶ 48].  Ruffin's EDPAS ratings both before and after the 2005-2006 period reflected "Highly Successful" ratings.  For 2004-2005, Ruffin's ratings were given by supervisor Lynda Gaddy and approved by Swanson-Hall, and for the period from May to September 2006, her ratings were given by Jordan and approved by Swanson-Hall.  [DSMF ¶ 49].

From 2004 to 2006, Plaintiff Wilma Bradley filed multiple EEO actions, Union grievances, or Unfair Labor Practice claims.[3]  [DSMF ¶ 50].  Bradley, a GS-11 Loan Analyst, received a "Successful" EDPAS rating for 2005-2006, issued by Jordan and approved by Swanson-Hall. [DSMF ¶¶ 3, 51].  Bradley had three first-line supervisors during the EDPAS year in question:   Adam Evans, who supervised her for approximately three months (May-July 2005) before his retirement; Swanson-Hall, Regional Director, who also served as Acting Branch Chief for four months (August to December 2005) just before the reorganization; and Jordan, then newly named

---

[3]Jordan was aware of Bradley's actions and the related investigations.  [PSMF ¶ 2].

14

Branch Chief, who served the remainder of the rating period (January to April 2006) as Bradley's supervisor and was the rating official.  [DSMF ¶ 52].

For Bradley's 2005-2006 EDPAS, Jordan assigned a numerical rating for each of the nine elements based on Swanson-Hall's input and his own experience managing Bradley.  [DSMF ¶ 58].  The EDPAS contains comments that were provided by Swanson-Hall, who rated Bradley at the successful level.  [DSMF ¶¶ 54, 57].  Bradley received a numerical rating of "4" ("Highly Successful") for seven of the nine elements and a rating of "3" ("Successful") for two elements.  [DSMF ¶ 59].  Jordan rated Bradley a "3" for Element I, Item 1 (i.e., processing assigned work) because while she did the work assigned to her, the amount of work that she received and completed did not justify support for a higher rating on that element.  [DSMF ¶ 60; Def. Ex. 34 at 170-72].  A management report showed that Bradley completed an estimated 29% of the top achiever and 50% of the top three performers in the AWG Branch in the same time frame and with relatively similar workloads.  [DSMF ¶ 62].

Larry Roles, a co-worker of Bradley's, was also a GS-11 Loan Analyst in the AWG Branch.  Roles holds a Masters Degree in Human Resources.  [DSMF ¶ 63].  Roles was on a detail with the Agency's office of Human Resources from October 2004 until October 2005 and was only in the AWG Branch for four months of the

15

rating period.  [DSMF ¶ 64].  Roles received an "Outstanding" EDPAS rating from Jordan for 2005-2006.  [Def. Ex. 35 ¶ 11].

Additional facts will be set forth below as they become necessary for discussion of Plaintiffs' claims.

## II.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (amended 2010).  Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  See Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).

The movant bears the initial burden of asserting the basis of his motion, and that burden is a light one.  See Celotex, 106 S. Ct. at 2553.  The movant is not required to

negate his opponent's claim.  <u>See id.</u>  Rather, the movant may discharge this burden merely by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  <u>Id.</u> at 2554.

When evaluating a motion for summary judgment, the court must view the evidence and factual inferences in the light most favorable to the nonmoving party.  <u>See</u> <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1309 (11th Cir. 2001).  However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986).  Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor."  <u>Fickling v. United States</u>, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990)).  The court will apply these standards in ruling on the motion for summary judgment.

## III.   Discussion

Plaintiffs Karen Morris, Debra Ruffin, and Wilma Bradley allege that Defendant subjected them to adverse employment actions in retaliation for prior complaints of discrimination in violation of Title VII.  [Doc. 29].  Plaintiff Morris, in support of her retaliation claims, alleges that she was reassigned to the AWG Branch, given a low

17

EDPAS rating, given undesirable work duties, and told by her supervisor via email that her time sheet was untimely.  [Doc. 29; Doc. 104 at 36-39].  Plaintiff Ruffin's retaliation claims are based on her reassignment to the AWG Branch and a low EDPAS rating.  [Doc. 29; Doc. 104 at 36-38, 40-41].  Plaintiff Bradley's retaliation claim is based on her low EDPAS rating.  [Doc. 29; Doc. 104 at 41-44].  Bradley also brings a Title VII claim for gender discrimination in which she alleges that her low EDPAS rating was issued to her because she is a female.  [Doc. 29; Doc. 104 at 46-49].

### A.    Plaintiffs' Retaliation Claims

Title VII acts to shield employees from retaliation for certain protected practices.  Specifically, the statute provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  The familiar McDonnell Douglas framework governs the allocation of burdens and order of presentation and proof, and they are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of retaliation; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden (of production) shifts to

18

the defendant to articulate some legitimate, non-discriminatory reason for the action taken against the employee; and (3) should the defendant carry this burden, the plaintiff must have an opportunity to prove that the legitimate reason offered by defendant was a pretext for retaliation. <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 93 S. Ct. 1817, 1824-25 (1973).

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. <u>Weeks v. Harden Mfg. Corp.</u>, 291 F.3d 1307, 1311 (11th Cir. 2002); <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1454 (11th Cir. 1998). The plaintiff "'need not prove the underlying claim of discrimination which led to [her] protest;' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed." <u>Holifield v. Reno</u>, 115 F.3d 1555, 1566 (11th Cir. 1997) (quoting <u>Tipton v. Canadian Imperial Bank of Commerce</u>, 872 F.2d 1491, 1494 (11th Cir. 1989)). Moreover, "[i]t is important to note that this circuit interprets the causation requirement broadly: 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" <u>Robinson v. AFA Service Corp.</u>, 870 F. Supp. 1077, 1083 (N.D. Ga. 1994) (quoting <u>EEOC v. Reichold Chems., Inc.</u>, 988 F.2d 1564,

19

1571 (11th Cir. 1993)); <u>see also</u> <u>Olmsted v. Taco Bell Corp.</u>, 141 F.3d 1457, 1460 (11th Cir. 1998).

### 1.    Retaliation Claims of Morris and Ruffin based on Reassignment to the AWG Branch

Plaintiffs Morris and Ruffin allege that they were subjected to retaliation when they were reassigned to the AWG Branch during the reorganization of Borrower Services in early 2006.  Both Plaintiffs are able to establish the first *prima facie* element because Morris and Ruffin were co-complainants in an EEO action filed in late 2003 or early 2004, which resulted in a settlement in 2005.  [PSMF ¶ 1; DSMF ¶ 36; Def. Exs. 7, 11].  Morris filed another EEO complaint in August 2004.  [Def. Ex. 7].  Defendant argues, however, that Plaintiffs are not able to establish the second *prima facie* element because their reassignments to the AWG Branch do not constitute adverse employment actions.  [Doc. 67 at 23-27].

The Supreme Court has held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 126 S. Ct. 2405, 2415 (2006) (citations and internal quotation marks

omitted). Noting that "the significance of any given act of retaliation will often depend upon the particular circumstances," the Court in <u>Burlington Northern</u> gave the following examples of how the context of an employment action determines whether it rises to the level of being materially adverse:

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. . . . A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

<u>Burlington Northern</u>, 126 S. Ct. at 2415-16.

As a result of the reorganization of Borrower Services, Plaintiff Morris was reassigned from the AWG Hearings Branch to the AWG Branch effective March 2006. [DSMF ¶ 19]. Plaintiff Ruffin was reassigned from the Contract Services Branch to the AWG Branch at the same time. [DSMF ¶ 38]. In March 2006, Morris asked to be transferred away from the AWG Branch and reassigned to the Contract Services Branch. [DSMF ¶ 25]. Morris gave Regional Director Erin Swanson-Hall a written complaint stating that she did not want to be assigned to work under John Jordan. [PSMF ¶ 5]. Ruffin also did not want to be reassigned to the AWG Branch and stated

21

in her affidavit, "I did not have the skill sets to work in AWG because I had never worked in the Branch. I had no work knowledge of how the AWG branch operated on a day to day basis nor the AWG policy, procedures or regulations." [Ruffin Aff. ¶ 5]. The court finds that these reassignments do not constitute adverse employment actions for a number of reasons.

First, when Swanson-Hall made the recommendation to reassign Plaintiffs Morris and Ruffin to the AWG Branch, she did not make this decision as a result of her own initiative. Both reassignments resulted from the reorganization of Borrower Services in late 2005 and early 2006, which involved personnel changes and the reassignment of job duties. [DSMF ¶ 10; Swanson-Hall Dep. at 19; Def. Ex. 3; Pla. Resp. to DSMF ¶ 10; Pla. Ex. 6]. Second, Plaintiffs Morris and Ruffin were not the only employees reassigned as a result of the reorganization. More than 50 percent (27 of 47 employees) of the Borrower Services staff, including eight of eleven GS-12 employees (among them Morris and Ruffin), were reassigned. [DSMF ¶ 14]. Third, although Morris asserts that being assigned to the AWG Branch during the reorganization was a materially adverse action, approximately a year before she had requested a transfer to the AWG Branch. [DSMF ¶ 22; Morris Aff. ¶ 10]. In support of her request to transfer to the AWG Branch, Morris stated that her "skills would be

22

beneficial to work on several writing tasks that are currently assigned to the AWG branch[,]" and she stated that she had "an AWG Branch proficiency." [DSMF ¶ 23].

The undersigned finds that a reassignment to the AWG Branch would not have dissuaded a reasonable employee from bringing a charge of discrimination. See Burlington Northern, 126 S. Ct. at 2415. The majority of employees in Borrower Services were reassigned as a result of the 2005-2006 reorganization, and Morris had even requested to be transferred to the AWG Branch. Plaintiffs have failed to offer evidence showing that a reasonable employee in the position of Morris or Ruffin would have found the reassignment to the AWG Branch to be materially adverse. As a result, Plaintiffs are unable to establish a *prima facie* case of retaliation. Defendant's summary judgment motion [Doc. 67] is, therefore, **GRANTED** on the retaliation claims asserted by Plaintiffs Morris and Ruffin based on the reassignments.[4]

---

[4]The parties do not address the issue, but it also seems clear that Plaintiffs are unable to establish the causal connection *prima facie* element. This is because there was such a long lapse of time between the EEO complaints and the reassignments. The evidence before the court indicates that Morris' final EEO complaint was lodged in August 2004 and Ruffin's complaint was lodged in late 2003 or early 2004. The decision to reassign Plaintiffs was made more than a year later in November 2005. The other acts of retaliation alleged by Morris occurred even later. The work duties Morris complains about occurred in early 2006, approximately a year and half after her EEO complaint, and the time sheet dispute occurred almost two years later in July 2006. As discussed *infra*, spans of even three to four months between the protected speech and the adverse action have been found to be too long to create an inference of

### 2.      Morris' Retaliation Claim based on Work Duties

Plaintiff Morris next alleges that she was subjected to retaliation when John Jordan assigned her GS-11 duties even though she was a GS-12 Loan Analyst. According to Morris, because she was not allowed to do GS-12 work under Jordan, her EDPAS rating was negatively affected and she was effectively demoted to the GS-11 level. [Doc. 104 at 16]. Morris also argues that when she took office as the President of the local union, her work duties were not reduced by 50 percent to cover union responsibilities. Morris stated, "[T]he work reduction was requested for 90 days, but the granting was temporary, and was not enforced at 50%. Work continued to be assigned to me, even when I [was] approved to be out of the office, and assigned work was already four and five days old upon my return to the office." [Morris Aff. ¶ 20]. Defendant argues that Morris has failed to show that Jordan's assignment of job duties was materially adverse, and the court agrees.

All GS-11 Loan Analyst duties are expressly subsumed in the GS-12 Loan Analyst position description, so a GS-12 Analyst is required to perform GS-11 Analyst

---

a causal link.  See Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004).  Thus, even assuming *arguendo* that Ruffin and Morris could show that their reassignments were materially adverse, summary judgment would be warranted on these claims.  The same is true with respect to Morris' retaliation claims based on her assigned work duties and her dispute with Jordan over a time sheet, discussed *infra*.

24

duties.  [Swanson-Hall Dep. at 58-59; Def. Ex. 18 ¶¶ 6-8; Def. Exs. 20, 21; DSMF ¶ 31].   Swanson-Hall testified that the GS-11 and GS-12 position descriptions are "almost identical position descriptions with the exception of mentoring and coaching and being responsible for other duties as assigned, including special projects." [PSMF ¶ 23].  Plaintiff Morris was a new GS-12 Analyst to the AWG Branch, and Jordan stated that Morris "was first given GS-11 duties, with the idea that as she gained more knowledge and became proficient performing the GS-11 functions, additional higher-level functions would be added."  [Def. Ex. 18 ¶ 8].  Morris needed to be trained, become acquainted with the AWG processes, and get up to speed with the other GS-12s.  [DSMF ¶ 32; Pla. Resp. to DSMF ¶ 32].  She has offered no evidence that a reasonable employee in Morris' position, that is, a GS-12 employee newly assigned to the AWG Branch, would have found the initial assignment of GS-11 duties to be a material adversity.

At the same time that Plaintiff Morris claims that she was treated adversely because she was assigned too little GS-12 work, she also claims that she was treated adversely because she was assigned too much work overall.  On January 31, 2006, Morris took office as President of the local union.  Morris requested and was granted a 50 percent reduction in work duties to cover union responsibilities.  [Def. Ex. 18 ¶

8; DSMF ¶ 33].  Morris argues that despite being granted the reduction, she was given more than half of a normal workload and was given work at times when she was on approved leave.  [Morris Aff. ¶ 20].

At the *prima facie* stage, it is the plaintiff's burden to show that she was subjected to a materially adverse action.  <u>McDonnell Douglas</u>, 93 S. Ct. at 1824-25. Plaintiff Morris has failed to carry this burden.  Plaintiff acknowledges that she was granted a work reduction that she requested so as to allow her to carry out her duties as a local union President.  Jordan stated, "The reduction of work was unprecedented and management was not obligated to do so."  [Def. Ex. 18 ¶ 8].  While Morris complains that this reduction in duties was temporary and that she was still assigned too much work, even if true, she has not presented evidence establishing that a reasonable employee in her position would believe that being assigned a workload that was slightly more than half of the amount assigned to her co-workers was a material adversity.

For these reasons, Plaintiff Morris is unable to carry her burden of showing that her work assignments "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington Northern</u>, 126 S. Ct. at 2415 (citations and internal quotation marks omitted).  She has failed to establish a *prima*

26

*facie* case of retaliation based on these allegations.  The court **GRANTS** Defendant's

summary judgment motion [Doc. 67] on Plaintiff Morris' retaliation claim based on

her work assignments.

### 3.      Morris' Retaliation Claim based on a Time Sheet Dispute

Plaintiff Morris next alleges that she was subjected to retaliation when she and

Jordan exchanged emails regarding a dispute about her time sheet.  On July 20, 2006,

Morris was at home on sick leave and submitted a time and attendance sheet to Jordan

by email.  Jordan sent an email to Morris stating that she should have sent her time

sheet to him by noon per his directive, but he received it at 1:52 p.m.  [Def. Ex. 23;

DSMF ¶ 34].  Under the terms of the Personnel Manual Instruction, an employee

absent due to illness is required to submit a leave request "prior to the leave period,

when possible, or immediately upon the employee's return from unscheduled sick

leave."  [Morris Aff. ¶ 21].  Defendant argues that Plaintiff cannot establish a *prima*

*facie* case of retaliation based on this email exchange because the incident does not rise

to the requisite level of adversity.  The court agrees.

Plaintiff Morris contends that being told by Jordan that she should have sent her

time sheet in earlier amounted to mistreatment which caused her diarrhea, severe

headaches, and dermatillomania (also known as compulsive skin picking).  [Morris

27

Aff. ¶ 22]. However, Morris was not disciplined for the incident, and her leave request for that day was approved by Jordan. [Morris Dep. at 32-36; DSMF ¶ 35]. Title VII "does not set forth 'a general civility code for the American workplace.'" Burlington Northern, 126 S. Ct. at 2415 (quoting Oncale v. Sundowner Offshore Services, Inc., 118 S. Ct. 998, 1002-03 (1998)). "Normally, petty slights, minor irritations, or the simple lack of civility will not deter a complainant." Heintz v. Fayette County Area Vocational Technical School, 2009 WL 1362044, at *10 (W.D. Pa. May 14, 2009) (citing DiCampli v. Korman Communities, 257 Fed. App. 497, 501 (3rd Cir. 2007)); accord Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("The Supreme Court, however, has emphasized that sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims. . . ."). Plaintiff Morris may have felt mistreated by Jordan as a result of this confrontation, but she has failed to carry her burden of showing that a reasonable employee would have found the confrontation to be materially adverse. See Carrio v. Apollo Group, 2009 WL 2460983, at *14 (N.D. Ga. August 7, 2009) (holding that a verbal confrontation in the workplace in which plaintiff was sent home for the day on paid administrative leave was not a materially adverse action supporting a retaliation claim). The court, therefore, finds that Morris is unable to establish a *prima facie* case of retaliation.

28

Defendant's summary judgment motion [Doc. 67] is **GRANTED** on Plaintiff Morris'

retaliation claim based on the email exchange with Jordan.

### 4. Retaliation Claims of Morris, Ruffin, and Bradley based on EDPAS Ratings

Plaintiffs Morris, Ruffin, and Bradley allege that they were subjected to

retaliation when they were given EDPAS ratings of "Successful" for the 2005-2006

ratings period.  Defendant seems to assume for the purposes of summary judgment that

all three Plaintiffs are able to show that they suffered adverse actions because they

were not eligible for monetary performance awards with a "Successful" rating.  [Doc.

67 at 29-30].   Defendant argues that summary judgment should be granted on

Plaintiffs' claims because they are not able to show that Defendant's proffered

legitimate, non-discriminatory reasons are pretexts for retaliation.

Defendant states in his brief the he "does not concede that Plaintiffs have

established a causal link between the protected activity and the adverse action," but

Defendant makes no other argument regarding the causal connection *prima*

*facie* element.  Instead, Defendant simply acknowledges that Jordan and Swanson-

Hall, who issued the EDPAS ratings, were aware of Plaintiffs' EEO filings.  [Doc. 67

at 30].  It does not appear to the court, however, that Plaintiffs have offered sufficient

29

evidence to establish a causal link between any complaint of discrimination and an adverse employment action.

If an employer takes an adverse employment action against an employee shortly after becoming aware of the employee's protected expression, then the short amount of time between the two events, standing alone, may be enough to produce an inference of retaliation.  See Robinson v. Intercorp, 512 F. Supp. 2d 1307, 1314 (N.D. Ga. 2007) ("Close temporal proximity may be sufficient to show that the protected activity and retaliatory actions were not 'wholly unrelated.'").  In Clark County School Dist. v. Breeden, 121 S. Ct. 1508, 1511 (2001), the Supreme Court stated that "mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be 'very close.'"  The Eleventh Circuit has noted that the Supreme Court in Breeden, 121 S. Ct. at 1511, "cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection." Higdon, 393 F.3d at 1220.

In the present case, both Morris and Ruffin filed an EEO complaint in late 2003 or early 2004.  [PSMF ¶ 1; DSMF ¶ 36; Def. Exs. 7, 11].  Morris filed another EEO complaint in August 2004.  [Def. Ex. 7].  Although unclear, it appears that the last complaint from Bradley prior to the allegedly adverse actions occurred when she

30

alleged gender discrimination in July 2005.  [Def. Ex. 33 at 3-4].  The EDPAS ratings

for all three Plaintiffs were issued in April 2006.  Thus, the EDPAS ratings were issued

nine months after Bradley's final complaint, 20 months after Morris' final complaint,

and more than two years after Ruffin's complaint.  All of these periods of time are far

too long to establish a causal connection.  See, e.g., Thomas v. Cooper Lighting, Inc.,

506 F.3d 1361, 1364 (11th Cir. 2007) (absent additional evidence establishing a causal

connection, the fact that the plaintiff was terminated on July 7, 2005, following

complaints of discrimination between April 8 and 11, 2005, is insufficient).  On this

basis, summary judgment is warranted on Plaintiffs' EDPAS retaliation claims.

     Nevertheless, because the parties do not address the causal connection element,

the court will proceed in its analysis of Defendant's summary judgment motion to the

next stage in the McDonnell Douglas burden shifting framework.  As discussed *supra*,

after the *prima facie* stage, the burden shifts to the defendant to articulate some

legitimate, non-discriminatory reason for the action taken against the employee.  See

Combs v. Plantation Patterns, 106 F. 3d 1519, 1528 (11th Cir. 1997) (citing McDonnell

Douglas, 93 S. Ct. at 1824;  Texas Dep't of Community Affairs v. Burdine, 101 S. Ct.

1089, 1094 (1981)).  "'[T]o satisfy this intermediate burden, the employer need only

produce admissible evidence which would allow the trier of fact rationally to conclude

31

that the employment decision had *not* been motivated by discriminatory animus.'" Id. (quoting Burdine, 101 S. Ct. at 1096) (emphasis in original). A "'defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" Id. (quoting Burdine, 101 S. Ct. at 1094). The defendant's burden in the rebuttal stage is "'exceedingly light.'" Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1556 (11th Cir. 1995) (quoting Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983)).

As discussed *infra*, Defendant is able to present legitimate, non-discriminatory reasons for the "Successful" EDPAS ratings for all three Plaintiffs. Thus, "the presumption of discrimination created by the McDonnell Douglas framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" Combs, 106 F.3d at 1528 (quoting Burdine, 101 S. Ct. at 1094-95 & n.10). The plaintiff then "has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." Holifield, 115 F.3d at 1565 (citing McDonnell Douglas, 93 S. Ct. at 1825). "[A] plaintiff may not in all cases merely rest on the laurels of her *prima facie* case in the face of powerful justification evidence offered by the defendant." Grigsby v. Reynolds

Metals Co., 821 F.2d 590, 596 (11th Cir. 1987).  Plaintiff's burden of demonstrating pretext merges with her "ultimate burden of showing that the defendant intentionally discriminated against the plaintiff."  Holifield, 115 F.3d at 1565 (citing St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2749 (1993)).  This task is a highly focused one.

The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct[.]'"  Combs, 106 F.3d at 1538 (quoting Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)).  "'[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason' as long as 'the reason is one that might motivate a reasonable employer.'"  Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001) (citation omitted).  Furthermore, as the Supreme Court has held, a reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  Hicks, 113 S. Ct. at 2752 (emphasis in original); accord Springer v. Convergys Customer Mgmt. Group Inc., 509 F.3d 1344, 1349 (11th Cir. 2007) ("A plaintiff must show not merely that the

33

defendant's employment decisions were mistaken but that they were in fact motivated by race.") (citations and internal quotation marks omitted).

### a.   Morris' Retaliation Claim based on her EDPAS Rating

Plaintiff Morris received an EDPAS rating of "Successful" for the 2005-2006 rating period, based on ratings of "3" for each critical element.   [DSMF ¶ 27]. According to Jordan, he considered written input provided by Swanson-Hall and Gary Hopkins (General Manager, Borrower Services), who had managed Morris during a 120-day detail from October 2005 to January 2006.   Hopkins had issued Morris a written interim rating of "Highly Successful" during the time when she had worked at a higher pay grade level of GS-13.   [Def. Ex. 16 ¶ 4; Def. Ex. 17 ¶¶ 3, 4; DSMF ¶ 28; Pla. Resp. to DSMF ¶ 28].   Defendant contends that Morris' "Successful" rating was appropriate given the low amount of her work output.   [Doc. 67 at 30-31].   According to data summaries of Morris' work output submitted by Jordan, from March-April 2006, the last two months of the EDPAS cycle, it took Morris between 8 and 21 days to complete garnishment verifications for 50 accounts.   Jordan stated, "It takes my slowest GS 11 loan analyst approximately 2.5 hours to complete a batch of 50 accounts."   [Def. Ex. 18 ¶ 8].   The court finds that Defendant has carried his burden

34

of offering legitimate, non-discriminatory reasons for giving Morris a "Successful" EDPAS rating.

Plaintiff Morris argues that Defendant's proffered reasons are pretexts for retaliation.  [Doc. 104 at 35-36].  According to Morris, Jordan did not sufficiently consider the written input and "Highly Successful" rating given by Gary Hopkins in a written summary of Morris' performance.  [Doc. 104 at 36].  Morris also contends that Defendant did not rate her "ability to meet deadlines and complete a fair share of the workload" and that she had submitted complaints "concerning the manipulation of the database, the unfair distribution of work, and the assignment date of the work entered into her work report in her absence."  [Id.].  Finally, Morris argues that Jordan knew that after the reorganization she did work for both the Loan Services Branch and the AWG Branch at the same time, but the "appraisal did not reflect management's knowledge of Ms. Morris' multiple duties."  [Id.].

Plaintiff Morris' pretext argument is not persuasive.  Morris has offered no support for her contention that Jordan did not sufficiently consider Hopkins' input when Jordan completed the EDPAS rating.  Moreover, Morris acknowledges that the comments Hopkins provided in his rating were reflected in the narrative of the EDPAS rating for the first critical element, which discussed the projects Morris handled while

working under Hopkins.  [Def. Ex. 7 ¶ 11; Def. Ex. 8; Morris Aff. ¶ 16; DSMF ¶ 29; Pla. Resp. to DSMF ¶ 29].  Although Morris alleges that Defendant failed to rate her "ability to meet deadlines and complete a fair share of the workload," the EDPAS form completed by Jordan shows otherwise.  [Def. Ex. 8 at 2].  Plaintiff was given a rating of a "3" for both of the following categories: "Meets essential deadlines and commitments" and "Accepts and completes a fair share of the workload."  [Id.]. Morris asserts that she complained to Swanson-Hall and Jordan that a database was manipulated, work was not distributed fairly, her work was not reported accurately, and the appraisal did not accurately reflect her duties, but she has not pointed to any evidence in the record showing that her complaints were meritorious.

It is clear that Plaintiff Morris believed that she deserved a higher EDPAS rating for the 2005-2006 period.  However, her beliefs regarding her job performance are not relevant to the pretext inquiry.  As the Eleventh Circuit recently explained:

> The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head. . . .  The question is not whether it really was [the plaintiff's] fault that assignments were not completed on time, or whether she did delegate excessively, or whether she was aggressive and rude to her colleagues and superiors, or whether she actually lost an important document or truly did fall asleep at her desk. The question is whether her employers were dissatisfied with her for

36

these or other non-discriminatory reasons, even if mistakenly or unfairly
so. . . .

Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010).

Because Jordan was the supervisor who completed Morris' EDPAS rating, the relevant

issue is whether Jordan honestly believed that Morris' job performance warranted a

rating of "Successful."   It is not germane to the pretext inquiry whether Morris

believed that her own work performance was good or whether she deserved a higher

rating.  As the Eleventh Circuit has explained, courts "'must be careful not to allow

Title VII plaintiffs simply to litigate whether they are, in fact, good employees.'"

Alvarez, 610 F.3d at 1266 (quoting Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir.

2002)).  Morris has not offered evidence which would allow a reasonable jury to find

that Defendant's proffered reasons for giving her a rating of "Successful" were not the

true reasons behind the decision.  See Combs, 106 F.3d at 1538.  Morris has failed to

carry her burden at the pretext stage, and Defendant's proffered legitimate, non-

discriminatory reasons stand unrebutted.

Even assuming *arguendo* that Plaintiff Morris were able to offer evidence

casting doubt on Defendant's proffered reasons, her retaliation claim still could not

survive summary judgment because she has not "shown *both* that the reason was false,

37

*and* that discrimination was the real reason." <u>Hicks</u>, 113 S. Ct. at 2752 (emphasis in original). Morris has not pointed to any evidence which would allow a reasonable factfinder to conclude that the decisionmakers involved in issuing her the EDPAS rating were motivated by retaliatory animus. Accordingly, Defendant's summary judgment motion [Doc. 67] is **GRANTED** on Plaintiff Morris' retaliation claim based on the EDPAS rating.

### b. Ruffin's Retaliation Claim based on her EDPAS Rating

Plaintiff Ruffin received an EDPAS rating of "Successful" from Jordan for the 2005-2006 rating period. [DSMF ¶ 43]. David Bartnicki provided input to Jordan for the evaluation because Bartnicki was Ruffin's first-line supervisor from May 2005 until February 2006. [DSMF ¶ 44]. Bartnicki stated that he had concerns about the quality of Ruffin's written product and her communication and customer service skills. [Def. Ex. 4 at 394-445; DSMF ¶ 45]. Bartnicki's concerns impacted two of the nine elements of Ruffin's EDPAS, which reflect a rating of "3/Successful." [Def. Ex. 4 at 403, 409, 425, 430, 441-42; Def. Ex. 9; DSMF ¶ 46]. The first was Element I, Item 5 – "Assists in the development of drafts/final documents, ensuring the proper use of format and language, and the accuracy of content. (Supports the strategic plan.)" [<u>Id.</u>]. The second element on which Bartnicki rated Ruffin a "3" was Element II, Item 5 –

"Communicates clearly, courteously, and effectively both orally and in writing with internal and external customers." [Id.].  In deciding the final rating, Jordan considered not only the input from Bartnicki but that provided by Gary Hopkins, who supervised Ruffin for 90 days of the rating period.  [DSMF ¶ 48].

Because Defendant has carried his burden of presenting legitimate, non-discriminatory reasons for giving Plaintiff Ruffin a "Successful" EDPAS rating, Ruffin has the opportunity to demonstrate that Defendant's proffered reasons are a pretext for retaliation.  Ruffin disagrees with Bartnicki's assessment and contends that all staff members committed errors, including an employee named Evelyn Gresham who allegedly "failed to complete thousands of accounts." [Doc. 104 at 40; Ruffin Aff. ¶ 8].  According to Ruffin, "All other employees in Mr. Bartnicki's branch, including Gloria Collins, Lisa White, Jane Meucci, and many others, had made the same errors at work and received Highly Successful or Outstanding ratings, with bonuses." [Doc. 104 at 40].  Plaintiff Ruffin also argues that pretext in Defendant's explanations for her "Successful" EDPAS rating can be established by the fact that she had numerous accomplishments in her work.  Ruffin created "forms that are presently used to this day by the Agency," "revised the CSB manual, monitored daily staff work, . . . was involved in the training of new staff in the CSB branch," and was the "Team Leader

39

for a new critical disability processes [sic] for the U.S. Department of Education for three regions."  [Doc. 104 at 40-41].

Plaintiff Ruffin's pretext arguments are unpersuasive.  The court notes initially that Ruffin based her *prima facie* case of retaliation on John Jordan's knowledge of her prior EEO complaints, alleging that Jordan issued her a low EDPAS rating in retaliation for prior complaints of discrimination.  However, in her pretext argument, Ruffin implicitly acknowledges that Jordan's EDPAS rating was not the result of any retaliatory animus but the result of Bartnicki's negative evaluation of her performance.  Ruffin then attempts to show that Bartnicki's stated concerns about her work were pretexts for retaliation.  But Plaintiff has offered no evidence that Bartnicki was even aware of her prior complaints, and this must be established in order to show that Bartnicki's decision to give her a low rating was caused by his desire to retaliate.  See Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him.").

Plaintiff Ruffin's pretexts arguments are also deficient because they essentially amount to a disagreement with her supervisors about her work performance.  Bartnicki stated that he had concerns about Ruffin's written work product and her

40

communication and customer service skills.  [Def. Ex. 4 at 394-445; DSMF ¶ 45].

With no supporting evidence, Ruffin simply states that "Bartnicki, contrary to his

testimony, did not have concerns" about her work.  [Doc. 104 at 40].  Ruffin also

contends that other employees made errors at work similar to hers but received a

higher rating.  [Id.].  This fact, if true, may be relevant to one aspect of Bartnicki's

concerns with Ruffin's work in the area of "the proper use of format and language, and

the accuracy of content."   But Ruffin's arguments do not address the other area of

concern cited by Bartnicki, which was titled, "Communicates clearly, courteously, and

effectively both orally and in writing with internal and external customers."  [Def. Ex.

4 at 403, 409, 425, 430, 441-42; Def. Ex. 9; DSMF ¶ 46].  Ruffin disagreed with

Bartnicki's assessment of her communication skills and testified that she "should have

gotten a four or a five" in the area of communicating with customers because,

according to Ruffin, "I've always treated all of our customers courteously and clearly.

I've never been abrupt to any private collection agency or anything like that." [Ruffin

Dep. at 50].  However, Ruffin, like Morris, attempts to establish pretext by arguing that

she is a good employee.  See Alvarez, 610 F.3d at 1266.  Ruffin's pretext argument

merely amounts to a quarrel with Bartnicki's ratings, and she does not point to

evidence that Bartnicki honestly did not have concerns with Ruffin's performance.  As

41

the Eleventh Circuit has held, "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000).

In summary, Jordan explained that he gave Plaintiff Ruffin a "Successful" rating based in large part on the input of Bartnicki, who was Ruffin's first-line supervisor for more than nine months during the review period.  Ruffin has not presented evidence which would allow a reasonable jury to find that the proffered reasons offered by Jordan or Bartnicki "'were not what actually motivated'" the "Successful" rating that was issued to Ruffin.  Combs, 106 F.3d at 1538 (quoting Cooper-Houston, 37 F.3d at 605).  Plaintiff has not only failed to show that the legitimate, non-discriminatory reasons were false, but she also has not offered evidence showing that retaliatory animus was the real reason for the rating.  See Hicks, 113 S. Ct. at 2752.  For these reasons, the undersigned concludes that Ruffin has not carried her burden at the pretext stage.  Defendant's summary judgment motion [Doc. 67] is **GRANTED** on Plaintiff Ruffin's retaliation claim based on the EDPAS rating.

42

### c.      Bradley's Retaliation Claim based on EDPAS Rating

Plaintiff Wilma Bradley received a "Successful" EDPAS rating for 2005-2006, issued by Jordan and approved by Erin Swanson-Hall. [DSMF ¶ 51]. Bradley had three first-line supervisors during the relevant ratings period: Adam Evans, who supervised her from May to July 2005; Swanson-Hall, Regional Director, who also served as Acting Chief for the AWG Branch from August to December 2005; and Jordan, then newly named Branch Chief, who supervised Bradley from January to April 2006 and was the rating official. [DSMF ¶ 52].

For Bradley's 2005-2006 EDPAS, Jordan assigned a numerical rating for each of the nine elements based on Swanson-Hall's input and his own experience managing Bradley. [DSMF ¶ 58]. The EDPAS contains comments that were provided by Swanson-Hall, who rated Bradley at the successful level. [DSMF ¶¶ 54, 57]. Bradley received a numerical rating of "4" ("Highly Successful") for seven of the nine elements, and a rating of "3" ("Successful") for two elements. [DSMF ¶ 59]. Jordan stated that he rated Bradley a "3" for Element I, Item 1, "processes assigned work," because while she did the work assigned to her, the amount of work that she received and completed did not justify support for a higher rating on that element. [DSMF ¶ 60; Def. Ex. 34 at 170-72]. A management report showed that Bradley completed an

43

estimated 29% of the top achiever and 50% of the top three performers in the AWG

Branch in the same time frame and with relatively similar workloads.  [DSMF ¶ 62].

Jordan stated that he rated Bradley a "3" for Element II, Item 2, "meets essential

deadlines and commitments," because of specific instances he described when Bradley

did not timely respond to management requests.  [Def. Ex. 34 at 175-77, 190-91].  For

example, Jordan stated that one directive which was given to the entire branch was to

report accomplishments prior to completing an interim report, and Bradley turned the

report in after the deadline and after everyone else had turned it in.  [Def. Ex. 34 at

175].  On another occasion, according to Jordan, Bradley failed to contact her assigned

private collections agencies after being instructed to do so.  [Id. at 175-76].

Plaintiff Bradley contends that Defendant's proffered reasons are pretexts for

retaliation.  Bradley notes that Adam Evans retired and did not provide input to Jordan

about Bradley's performance during his supervision of her for three months during

2005.  [Doc. 104 at 41].  According to Bradley, Jordan did not receive proper input

from Swanson-Hall because a list of accomplishments provided by Bradley in

February 2006 was not considered by Swanson-Hall.  [Id.].  The Personnel Manual

Instruction provides in pertinent part that employees were "strongly encouraged to

provide the supervisor with a list of tangible accomplishments for each critical

element," and that supervisors would consider these accomplishments when evaluating work performance. [Def. Ex. 4-1 at 8-9; Doc. 69, Attach. 4 at 8-9]. Bradley contends that a co-worker named Larry Roles was allowed to include his accomplishments that he believed should have been included in his EDPAS. [Doc. 104 at 41-42]. Bradley also argues that her rating did not reflect the quality of her work and failed to take into account her work on special projects and her assistance to supervisors, co-workers, and private collection agencies. [Doc. 104 at 42]. The court finds Bradley's pretext arguments unpersuasive.

With regard to input Jordan received from Plaintiff Bradley's other supervisors, Bradley correctly notes that Adams retired before providing input about her performance. [Doc. 104 at 41]. However, Bradley has failed to show how Adams' failure to provide input before his retirement casts doubt on Jordan's proffered reason for giving Bradley a "Successful" rating. Bradley also alleges that Swanson-Hall did not consider her accomplishments when submitting input to Jordan and that Roles was allowed to submit his accomplishments. [Doc. 104 at 41-42]. But Bradley has failed to offer evidence supporting her contention that her accomplishments were not considered. Furthermore, Swanson-Hall responded to each of Bradley's alleged accomplishments and explained why some of them were not valid, and she stated that

45

the accomplishments that were valid were considered and "resulted in several elements increasing from a Successful to a Highly Successful level." [Def. Ex. 33 ¶¶ 17-19; Def. Ex. 34 at 302-06]. The narrative portion of Bradley's EDPAS not only explains the justification for the ratings, but it also reveals that her accomplishments were not ignored by her supervisors. [Def. Ex. 10]. For example, under Element I, "Organization Priorities," the narrative reads:

> For this period Wilma completed 266 batches for a total of 10415 accounts. She completed 845 items of correspondence. She is quick to identify problems in our work process and make suggestions to possibly correct or improve the issue. She is helping to mold our non compliant employer actions and set up litigation requirements.

[Def. Ex. 10 at 1]. Under Element II, "Customer Service," the narrative reads:

> From August through December 05-Wilma successfully completed her assigned work, which included validation batches, etc. In doing so-she ensured it was timely and accurate. In addition, Wilma participated in an onsite review. In doing so-she assisted in conducting a PCA review of AWG and developing the post-review report. Her suggestions and insights were helpful throughout the review process. Wilma is extremely accurate in her writings and analytical reviews.

[Def. Ex. 10 at 2]. These explanations in Bradley's EDPAS review contradict her contention that her accomplishments were not considered.

Plaintiff Bradley has failed to demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

46

reasons for its action'" that a reasonable jury could find them lacking in credibility. Combs, 106 F.3d at 1538 (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3rd Cir. 1996) (en banc), cert. denied, 117 S. Ct. 2532 (1997)). As a result, Defendant's multiple legitimate, non-discriminatory reasons stand unrebutted. Crawford v. City of Fairburn, Georgia, 482 F.3d 1305, 1309 (11th Cir. 2007) ("By failing to rebut each of the legitimate, nondiscriminatory reasons of [Defendant], [Plaintiff] has failed to raise a genuine issue of material fact about whether those reasons were pretext for discrimination."). Moreover, like Morris and Ruffin, Bradley has failed to offer any evidence that the decisionmakers involved in issuing her "Successful" rating were motivated by retaliatory animus. See Hicks, 113 S. Ct. at 2752. For these reasons, Defendant's summary judgment motion [Doc. 67] is **GRANTED** on Plaintiff Bradley's retaliation claim based on the EDPAS rating.

## B.     Bradley's Gender Discrimination Claim based on EDPAS Rating

The final claim before the court is Plaintiff Bradley's Title VII gender discrimination claim based on the EDPAS rating she received for the 2005-2006 year. In support of this claim, Bradley offers the same facts which she cited in support of her retaliation claim. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

47

employment, because of such individual's . . . sex. . . ."  42 U.S.C. § 2000e-2(a)(1).

Plaintiff can establish a *prima facie* case of sex discrimination by proving (1) that she

was within a protected class; (2) that she suffered an adverse employment action; and

(3) that a similarly situated employee not within her protected class was treated more

favorably.  <u>See</u> <u>Burdine</u>, 101 S. Ct. at 1096.  Bradley is able to establish the first and

second elements because she is a female, and as discussed *supra*, she was issued a

rating of "Successful" which made her ineligible for a monetary performance award.

To establish the final *prima facie* element, Plaintiff Bradley must offer evidence

that Defendant treated a similarly situated male employee more favorably.  The

Eleventh Circuit has held, "The comparator must be nearly identical to the plaintiff to

prevent courts from second-guessing a reasonable decision by the employer."  <u>Wilson</u>

<u>v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1091 (11th Cir. 2004) (citing <u>Silvera v. Orange</u>

<u>County School Bd.</u>, 244 F.3d 1253, 1259 (11th Cir. 2001)).  The "'quantity and quality

of the comparator's misconduct'" must also be nearly identical.  <u>Burke-Fowler v.</u>

<u>Orange County, Florida</u>, 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting <u>Maniccia v.</u>

<u>Brown</u>, 171 F.3d 1364, 1368 (11th Cir. 1999)).  "It has been stated that similarly

situated employees 'must have reported to the same supervisor as the plaintiff, must

have been subject to the same standards governing performance evaluation and

48

discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating conduct that would distinguish their conduct or the appropriate discipline for it.'" Gaston v. Home Depot USA, Inc., 129 F. Supp. 2d 1355, 1368 (S.D. Fla. 2001) (quoting Mazzella v. RCA Global Communications, Inc., 642 F. Supp. 1531, 1547 (S.D. N.Y. 1986)); accord Sanguinetti v. United Parcel Serv., Inc., 114 F. Supp. 2d 1313, 1317 (S.D. Fla. 2000). And see Wills v. Postmaster Gen., 300 Fed. Appx. 748, 751 (11th Cir. 2008) ("Wills provided numerous examples of situations in which he felt he was mistreated, but . . . in many instances, white employees were subject to the same treatment. Thus, because Wills did not show that he was treated differently than any other similarly situated employees, the USPS was entitled to summary judgment on his Title VII disparate treatment claims.").

Plaintiff Bradley cites Larry Roles as a similarly situated employee who was treated more favorably. Roles received an "Outstanding" EDPAS rating from Jordan for 2005-2006 and, thus, was eligible for a monetary award. [Def. Ex. 35 ¶ 11]. Defendant argues that Roles was not similarly situated to Bradley because he holds a Masters Degree and was only in the AWG Branch for four months of the rating period while he was on a separate detail. [Doc. 67 at 40]. For purposes of evaluating Defendant's summary judgment motion, the court finds that Roles was similarly

49

situated to Bradley.  Despite any differences in education, both Roles and Bradley were GS-11 Loan Analysts.  Roles worked in the AWG Branch with Bradley.  And while some of Roles' work during the 2005-2006 period occurred on a separate detail, both he and Bradley reported to the same supervisor who issued the EDPAS ratings, John Jordan.  [DSMF ¶ 63].

Plaintiff Bradley, therefore, is able to establish a *prima facie* case of sex discrimination.  This means that the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for giving Bradley a "Successful" EDPAS rating for the 2005-2006 period.  See Burdine, 101 S. Ct. at 1094.  As discussed in detail *supra*, Defendant has proffered numerous legitimate reasons for the rating, and Bradley has failed to offer evidence which would allow a reasonable jury to conclude that these reasons were pretextual.  Combs, 106 F.3d at 1538.  Bradley also has not presented evidence that Jordan or Swanson-Hall or any other decisionmaker involved in the EDPAS rating was motivated by sexually discriminatory animus.  See Hicks, 113 S. Ct. at 2752.  Therefore, Defendant's summary judgment motion [Doc. 67] is **GRANTED** on Bradley's gender discrimination claim based on the EDPAS rating.

50

**IV.    Conclusion**

For all the foregoing reasons and cited authority, the court **ORDERS** that Defendant's motion [Doc. 67] for summary judgment be **GRANTED** on all of Plaintiffs' claims and that they be **DISMISSED WITH PREJUDICE**.

Judgment shall be entered in favor of Defendant.

**SO ORDERED**, this 12th day of April, 2011.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A

(Rev.8/82)